In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2588

ABSTRACT & TITLE GUARANTY COMPANY, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

CHICAGO INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
No. 05 C 188—**John Daniel Tinder**, *Judge.*

ARGUED JANUARY 19, 2007—DECIDED JUNE 5, 2007

Before RIPPLE, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* This diversity case comes to us after entry of summary judgment in favor of the defendant. The plaintiff appeals. For the reasons set forth below, we affirm.

## I. BACKGROUND

Abstract & Title Guaranty (ATG) provided services in connection with real estate transactions. It obtained an errors and omissions policy from Chicago Insurance Company (CIC) covering the period from November 2001

to December 2002. ATG fell in with a company called Royal Haven Builders and its principal Eric Tauer. This turned out to be a tremendously bad business decision. It appears that as Royal Haven began a long decline into bankruptcy, fraud, and check kiting,[1] an employee of ATG had started slipping funds intended for third parties under the table directly to Royal Haven. That same employee also failed to look after other interests of parties to whom ATG owed contractual and fiduciary duties in these complex real estate development deals. Not surprisingly, some of those who had been defrauded by Royal Haven and the complicit ATG employee took notice when millions of dollars worth of deals went sour.

In September 2002, ATG first notified CIC about "an incident(s)" that had been brought to their attention within the last few weeks. The initial dialog between ATG and CIC was predictable. There was some discussion of whether the "incident(s)" would count as a single claim or multiple claims. CIC conducted some investigation of the coverage, the facts of the case, and policy exclusions. But it was not long before ATG was indicating that there might be hundreds of claims forthcoming. Over the next few months, CIC apparently began to sense that claimants were circling ATG much like stick-wielding children around a piñata. By the spring of 2003, there were nearly one hundred claims pending against ATG, totaling over $15 million. And then the lawsuits started.

In April 2003, as ATG started getting served with legal complaints, CIC came to the realization that the value of

---

[1] Although not directly relevant to this insurance dispute, we note that Tauer was recently sentenced to a substantial prison term for his role in various criminal aspects related to this mess. *United States v. Tauer*, No. IP05-CR-0028-01 (S.D. Ind. Apr. 18, 2007).

the eventual claims against ATG was going to dwarf CIC's potential maximum liability. So CIC filed an interpleader action in the federal district court and deposited with the court an amount equal to its limit of coverage. *Chicago Ins. Co. v. Abstract & Title Guar., Inc.*, No. 1:03-CV-0590 (S.D. Ind.). As ATG was facing looming deadlines in the various state court causes of action, CIC advised ATG to hire counsel of their choosing and seek payment of those legal fees out of the interpleaded policy limits. Eventually the district court disbursed the deposited funds to the various claimants in accordance with a settlement agreement. As part of that settlement agreement, ATG received $120,500 (the largest share of any claimant). The remainder was divvied up among seven other claimants.

ATG then brought the present action in state court against CIC, alleging that CIC had breached its insurance contract by interpleading the coverage limits and by not defending ATG in court. ATG also alleged that CIC had failed to deal in good faith. CIC removed the case to the federal district court. The parties brought cross-motions for summary judgment, and on May 12, 2006, the district court entered summary judgment in favor of CIC. This appeal followed.

## II. ANALYSIS

We review an entry of summary judgment *de novo*. *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007). We view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* Summary judgment is appropriate where the evidence before the court indicates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

The relevant terms of the insurance policy that are now at the heart of this dispute can be summarized as follows.

The policy set a $500,000 limit of liability, both in the aggregate and for each individual claim. The policy stated that claim expenses are included within the limits of liability. Claim expenses are defined in the contract to include:

> Fees charged by (an) attorney(s) designated by [CIC] and all other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim, suit or proceeding arising in connection therewith, if incurred by [CIC], or by [ATG] with written consent of [CIC] Policy ¶ VII.

Finally, CIC also had a contractual "right and duty to defend" any suit against ATG, and the contract provided that CIC "at its option, shall select and assign defense counsel." Policy ¶ I. But CIC did not have a duty "to defend or continue to defend after the applicable limit of [CIC's] liability [had] been exhausted by the payments of judgments, settlements, Damages or Claim Expenses, as applicable." *Id.*

ATG argues that CIC breached its contract in two ways: by paying the money to the court in the interpleader action and by not defending the claims. This is a question of state law, and when the highest court in the state has not spoken we must attempt to predict how we believe that court would decide. *State Farm Mut. Auto Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). We look to decisions of intermediate appellate courts in the state for persuasive guidance in that endeavor. *Id.* The parties have not identified for us, nor is the court able to locate, controlling Indiana Supreme Court precedent on this question.

However, while this case was pending the Indiana Court of Appeals decided a similar question in *Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669 (Ind. Ct. App. 2007). In *Mahan*, an automobile insurer faced a situation where

the number and value of potential claims against the insured might have exceeded the insurer's total liability. *Id.* at 674. The policy included a clause that shifted the burden to defend or settle onto the insurer, but the contract also included a clause that disavowed any duty to defend after the limits of liability had been paid. *Id.* at 671. As the claims started to loom, the insurer initiated an interpleader action and deposited with the court the total sum of its liability under the policy. *Id.* at 671-72. The court eventually divided the funds amongst the injured parties. *Id.* at 672. The insured counter-claimed against the insurer alleging breach of contractual duties to defend and bad faith. *Id.* at 672-73.

On nearly identical facts to this case, the Indiana Court of Appeals held in *Mahan* that there was no breach of contract for interpleading and failing to defend. *Id.* at 676-77. This appears to resolve the question of whether Indiana law allows the use of interpleader as a method of paying the policy limits. But the court rested its "failure to defend" decision on additional grounds that are not present here: in *Mahan*, the insurer interpleaded before the first lawsuit was filed against the insured. *Id.* In this case, ATG had already been served a complaint before CIC filed the interpleader. *Id.* The question before us is whether this difference should lead us to a result that is contrary to *Mahan*. On the basis of the language of the contract, we conclude that it should not.

In Indiana, when an insurance contract "is clear and unambiguous, the language therein must be given its plain meaning. On the other hand, where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured." *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002) (citing *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000); *Am. States Ins. v. Kiger*,

662 N.E.2d 945, 947 (Ind. 1996); *Allstate Ins. Co. v. Boles*, 481 N.E.2d 1096, 1101 (Ind. 1985) (internal quotations omitted)).

This all comes down to the question of whether the deposit of the funds with the court constitutes a payment of claim expenses. If it is, then CIC has exhausted its obligations under the contract. ATG indicates in its reply brief that perhaps CIC owed more than $500,000. Appellant's Reply Br. at 7-8. This argument was not raised below, nor was it raised in ATG's initial brief. Arguments that first appear in a reply brief are deemed forfeited. *Carter v. Tenant Co.*, 383 F.3d 673, 679 (7th Cir. 2004). The definition of a claim expense is expansive in this contract. We repeat the relevant part: "all other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim, suit or proceeding arising in connection therewith, if incurred by [CIC]." CIC deposited the sum total of its financial obligations into the court's coffers for the purpose of satisfying the claims that were piling up against ATG. There can be few actions that would fall more plainly within the meaning of "costs [or] expenses resulting from the . . . adjustment . . . of a claim . . . incurred by CIC." We see nothing ambiguous about this language, despite the parties' best efforts at obfuscation. Having paid its limit in claims expenses, the contract between the parties clearly instructs that CIC was under no obligation to defend or to continue to defend ATG. Indeed, the contract even goes so far as to allow CIC, if already actively defending ATG, to throw up their hands and not "continue" any longer. In light of such strong language, we would be hard pressed to read this contract to require CIC to both defend the suits and pay to its full limits.

The appellant cites to a handful of cases from other jurisdictions that have held insurers on the hook to defend their insured parties above and beyond interpleading

the policy limits. Appellant's Br. at 15-16. We recognize that there is significant disparity among jurisdictions in resolving this question, and that questions of policy might lead a state to require insurers to defend above and beyond interpleading. *See, e.g.*, *J. Kraut, Liability Insurer's Duty to Defend Action against an Insured After Insurer's Full Performance of its Payment Obligations under Policy*, 27 A.L.R.3d 1057. As CIC notes, many of the cases cited by ATG involved contracts, unlike this contract, that did not specifically allow the insurer to terminate defense upon full payment. Appellee's Br. at 18-19. Although the citation to those cases from other jurisdictions is informative, the cases lose much of their persuasive power in light of the recent holding in *Mahan* where the Indiana Court of Appeals *did* allow an insurer to walk away after interpleading. We have nothing before us to indicate that this decision by the Indiana Court of Appeals is not an accurate prediction of how the Indiana Supreme Court would hold on this question of law.

In summary, a jurisdiction might choose to have a law that prevents an insurer from interpleading the policy limit. Such a law might require that insurers pay claims one at a time in the order that they are filed, or perhaps find some other way to prioritize the claims. Some jurisdictions have chosen such a rule of law, but the Indiana Court of Appeals in *Mahan* indicates that Indiana is not one of them. Furthermore, a company might choose to buy an insurance policy that requires the insurer to defend even after the policy limits are met, or to prioritize legal fees so that they are paid before other claim expenses and damages. ATG did not choose to buy such a policy, but instead asks the courts to write that requirement into its contract after the fact. We decline to do so. In light of these facts, we agree that summary judgment in favor of CIC was proper on the question of breach of contract.

ATG also argues that CIC has breached its duty of good faith throughout these proceedings. The good faith requirement under Indiana law prevents an insurer from "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.*" Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). We find ourselves, once again, instructed by the recent decision in *Mahan*. On nearly identical facts, the court held that the insurer did not breach its duty of good faith because the insurer had a rational reason for filing the interpleader. A finding of bad faith "requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Mahan*, 862 N.E.2d at 677 (citing *Colley v. Ind. Farmers Mut. Ins. Group*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)). There, like here, "after investigating the facts and circumstances surrounding the accident, [the insurer] determined that [the insured] was [liable], and . . . most likely would be subject to multiple claims, the total of which would meet, if not exceed, the limits of the policy . . . . [The insurer] did not breach its duty of good faith. " *Mahan,* 862 N.E.2d at 677. We see no evidence that leads us to a contrary conclusion in this case.

## III. CONCLUSION

For the forgoing reasons, we AFFIRM the decision of the district court granting summary judgment in favor of Chicago Insurance Company.

No. 06-2588                                              9

A true Copy:

 Teste:

       _____
       *Clerk of the United States Court of*
       *Appeals for the Seventh Circuit*