## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 06 2015, 8:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kevin L. Moyer
Moyer & Irk, P.C.
Lebanon, Indiana

ATTORNEYS FOR APPELLEE

Grover B. Davis
McClure McClure & Davis
Indianapolis, Indiana

C. Zachary Ransel
Fisher Kanaris, P.C.
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

Greater New Jerusalem Temple of Truth, Inc.,

*Appellant-Plaintiff,*

v.

Sentinel Insurance Company, Ltd.,

*Appellee-Defendant*

August 6, 2015

Court of Appeals Case No. 49A02-1501-PL-61

Appeal from the Marion Superior Court

The Honorable Thomas J. Carroll, Judge

Case No. 49D06-1107-PL-27306

**Crone, Judge.**

# Case Summary

In December 2009, Greater New Jerusalem Temple of Truth, Inc. ("GNJ"), purchased a commercial policy from Sentinel Insurance Company, Ltd. ("Sentinel"), that provided coverage for damage caused by "collapse" under certain circumstances. In October 2010, ceiling tiles fell onto the floor of GNJ's church sanctuary. GNJ filed a claim with Sentinel, which denied the claim on the basis that the damage caused by the fallen ceiling tiles was not covered under the policy. GNJ filed a complaint against Sentinel alleging breach of contract and bad faith and seeking punitive damages. Sentinel filed a motion for summary judgment, which the trial court granted.

On appeal, GNJ contends that the trial court erred in granting Sentinel's summary judgment motion. We disagree and therefore affirm.

# Facts and Procedural History

The relevant facts are undisputed. Bishop Herman Davis is the leader of GNJ, which purchased a 1950s-era church building in Indianapolis in 2002. Later that year, GNJ hired Master Built Construction, Inc. ("Master Built"), to repair the roof after Bishop Davis noticed water leaking from the ceiling. Master Built's contract with GNJ called for installing new shingles, repairing "all broken rafters," and reinforcing the rafters "to prevent further spreading of the roof system." Appellant's App. at 142.

[4]    In 2006 or 2007, Bishop Davis noticed that the ceiling tiles in the sanctuary were separating. In an attempt to fix the problem, one of GNJ's deacons went into the attic and nailed sixteen-foot 2 × 8 boards to the roof trusses.

[5]    In June 2009, GNJ asked Higginson Construction to inspect the roof. Owner James Higginson found fifteen broken roof trusses and submitted a repair proposal totaling $5500 to Bishop Davis. In July 2009, Higginson gave Bishop Davis another proposal outlining additional "structural issues" and "roof problems" and estimating the total repair cost at over $45,000. *Id*. at 164. GNJ did not have Higginson perform any of the recommended repairs.

[6]    In September 2009, GNJ's attorney sent Master Built a letter citing the following "problems" that had "occurred to the structure of the building" due to its alleged negligence in repairing the roof in 2003:

> 1) There were three layers of shingles placed on the roof causing the structure to shift because of the extra weight,
>
> 2) No air vents were inserted in the roof, thus no air flow causing the wood to deteriorate in the upper portion under the roof, causing the "A Frame" of the building to crack,
>
> 3) The bricks near the top of the building are shifting and beginning to lean and the walls are cracking due to the weight of the shingles,
>
> 4) The windows are slipping from their frames due to pressure and the frame work shift, and
>
> 5) Ceiling tiles are beginning to buck out and slip because of the moisture entering through the upper level and because of no ventilation.

*Id*. at 167-68.

In December 2009, GNJ switched insurance carriers and purchased a commercial policy from Sentinel that reads in pertinent part as follows:

> **B. EXCLUSIONS**
>
> ….
>
> 2. We will not pay for physical loss or physical damage caused by or resulting from:
>
> ….
>
> **h. Collapse:** Collapse, except as provided in the Additional Coverage for Collapse. But if loss or damage by a Covered Cause of Loss results at the "scheduled premises", we will pay for that resulting loss or damage.

*Id*. at 97-98.

> **5. Additional Coverages**
>
> **a. Collapse**
>
> (1) With respect to Buildings:
>
> (a) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building cannot be occupied for its intended purpose;
>
> (b) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;
>
> (c) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;
>
> (d) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or

expansion.

(2) We will pay for direct physical loss or physical damage caused by or resulting from risks of collapse of a building or any part of a building that is insured by this policy caused only by one or more of the following:

(a) "Specified cause of loss" or breakage of building glass, if such loss or breakage was covered by this policy;

(b) Decay that is hidden from view, unless the presence of such decay was known to an insured prior to collapse;

(c) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

(d) Weight of people or personal property;

(e) Weight of rain that collects on a roof; and

(f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

*Id.* at 84.

[8] In October 2010, ceiling tiles fell onto the sanctuary floor. GNJ submitted a claim to Sentinel, which had forensic structural engineer Brian Kinsey investigate the incident. In December 2010, Kinsey submitted a report to Sentinel that reads in relevant part as follows:

The east and west exterior walls are out-of-plumb. The west wall measured 9 inches out-of-plumb. There are several horizontal cracks in the east and west walls through the mortar joints. The cause of the out-of-plumb condition of the walls is due to the outward thrust on the walls caused by ongoing outward lateral movement of the roof/ceiling trusses.

On the interior, a 6' by 8' section of ceiling finish (12" square fiberboard tiles) have come loose from the ceiling. The cause of the ceiling finish failure is due to the outward movement of the roof/ceiling structure.

Inspection in the attic revealed the cause of the outward movement of the roof/ceiling structure. Several cracks and splits exist in the 2 x 8 lower chord members of the trusses. The loss of strength resulting from the failed truss members has allowed the trusses to spread outward, causing the roof to sag downward and the walls upon which the trusses rest (the east and west exterior walls) to push outward. The trusses are under-designed. The 2 x 8 members are too small given the loss of section (wood) at the bolted attachment locations where holes are drilled in the members.

Repairs have been previously made, reportedly 3 years ago, in an attempt to arrest the outward movement of the trusses. Sixteen foot long 2 x 8's have been nailed to the trusses at approximately every 8 feet as a kind of "collar tie" in an effort to stabilize the trusses and prevent further movement. Obviously, with the recent detachment of a section of ceiling tile, the "fix" has not arrested further movement of the trusses.

Because future movement of the roof/ceiling system is likely, coupled with the fact that the exterior masonry walls are significantly out-of-plumb and therefore in a structurally precarious condition, it is our technical opinion that a catastrophic collapse of the roof/ceiling and walls could occur without warning. We therefore highly recommend that the building not be further occupied.

In our opinion, further patchwork repairs to reinforce the roof/ceiling and walls will not be cost effective. The entire east and west walls need to be rebuilt, as does the entire roof/ceiling structure.

Appellee's App. at 11-12.

[9]     Sentinel denied GNJ's claim on the basis that the damage caused by the fallen ceiling tiles was not covered under the policy. In April 2011, Sentinel canceled the policy. Three months later, the church's roof caved in.

Shortly thereafter, GNJ filed a complaint against Sentinel alleging breach of contract and bad faith and seeking punitive damages. Sentinel filed a summary judgment motion asserting that GNJ was not entitled to coverage on several grounds. After a hearing, the trial court summarily granted Sentinel's motion. GNJ now appeals.

## Discussion and Decision

GNJ asserts that the trial court erred in granting Sentinel's summary judgment motion.

> Pursuant to Indiana Trial Rule 56(C), summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. When reviewing a decision to grant summary judgment, we apply the same standard as the trial court. We must determine whether there is a genuine issue of material fact requiring trial, and whether the moving party is entitled to judgment as a matter of law. Neither the trial court nor the reviewing court may look beyond the evidence specifically designated to the trial court. A party seeking summary judgment has the burden of making a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial.

*Gentry v. Day*, 22 N.E.3d 710, 713 (Ind. Ct. App. 2014) (citations and quotation marks omitted).

"A genuine issue of material fact exists when the facts relevant to an issue that would dispose of the litigation are disputed or where undisputed material facts could support conflicting inferences on a dispositive issue." *Frontz v. Middletown*

*Enters., Inc.*, 15 N.E.3d 666, 668 (Ind. Ct. App. 2014), *trans. denied* (2015). "We construe all facts and reasonable inferences drawn from those facts in a light most favorable to the nonmoving party." *Kelly v. Hamilton*, 816 N.E.2d 1188, 1191 (Ind. Ct. App. 2004). "The interpretation of an insurance policy is primarily a question of law and, therefore, is a question particularly suited for summary judgment." *Hammerstone v. Ind. Ins. Co.*, 986 N.E.2d 841, 846 (Ind. Ct. App. 2013). "Where terms are unambiguous, they should be given their plain and ordinary meaning." *Id.* On appeal, the nonmoving party has the burden of proving that the grant of summary judgment was erroneous, but we review the trial court's decision carefully to ensure that the nonmovant was not improperly denied its day in court. *Id.* We may affirm summary judgment if it is proper on any basis shown in the record. *Weist v. Dawn*, 2 N.E.3d 65, 67 (Ind. Ct. App. 2014).

[13] GNJ contends that the falling of the ceiling tiles constitutes a "collapse" and therefore triggers coverage under the policy. GNJ essentially concedes that the only basis for coverage would be a collapse caused by decay. Sentinel raises several counterarguments, only one of which we address: assuming that a collapse occurred, is there a genuine issue of material fact regarding whether it was caused by decay? We think not.

[14] In support of its summary judgment motion, Sentinel designated Kinsey's report and an affidavit in which he opined that "[t]he cause of the ceiling tiles falling down … was due to the outward movement of the roof-ceiling structure due to the defectively designed trusses[.]" Appellee's App. at 4. In other

words, Sentinel made a prima facie showing that the collapse was not caused by decay and therefore was not covered under the policy. In response to Sentinel's summary judgment motion, GNJ designated Kinsey's deposition, in which he acknowledged that "the bolt design, the additional weight of the shingles, and the age of the actual truss members" were the three factors "first and foremost" in his mind "that would have contributed to [the] movement of the roof structure[.]" Appellant's App. at 239. Nowhere, however, did Kinsey equate age with decay or opine that the collapse was caused by decay. In other words, GNJ failed to establish a genuine issue of material fact regarding the cause of the collapse.[1] Therefore, we affirm the trial court's grant of summary judgment in Sentinel's favor.

Affirmed.

Brown, J., and Pyle, J., concur.

---

[1] To the extent that any designated evidence suggests that the collapse could have been caused in part by decay of the roof structure, we note that GNJ's letter to Master Built indicates that GNJ was aware of such decay long before the collapse and therefore would not be entitled to coverage under the policy.